# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

## UNITED STATES

### v.

## Airman First Class JOSEPH M. GALLEGOS, JR.
### United States Air Force

## ACM 38546

## 26 August 2015

Sentence adjudged 2 November 2013 by GCM convened at Little Rock Air Force Base, Arkansas. Military Judge: Bradley A. Cleveland (sitting alone).

Approved Sentence: Confinement for 7 years and reduction to E-1.

Appellate Counsel for the Appellant: Major Thomas A. Smith and William E. Cassara (civilian counsel).

Appellate Counsel for the United States: Major Daniel J. Breen; Major Roberto Ramirez; and Gerald R. Bruce, Esquire.

Before

HECKER, TELLER, and BENNETT
Appellate Military Judges

OPINION OF THE COURT

This opinion is issued as an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.

BENNETT, Judge:

A general court-martial composed of a military judge sitting alone convicted the appellant, contrary to his pleas, of sexual assault and abusive sexual contact, in violation of Article 120, UCMJ, 10 U.S.C. § 920. The court sentenced him to confinement for 7 years and reduction to E-1. The convening authority approved the sentence as adjudged.

On appeal, the appellant contends the evidence is both legally and factually insufficient to support the findings and that his sentence is inappropriately severe. We also specified an issue regarding whether the military judge erred by not consolidating or dismissing one or more specifications after finding them to be unreasonably multiplied. We affirm the findings, but, for the reasons provided below, consolidate the specifications of each charge. We affirm the sentence as adjudged.

*Background*

The victim in this case, Airman First Class (A1C) MM, and the appellant were friends who knew each from work and from serving as resident advisors for the dormitories. Some witnesses testified that they thought A1C MM and the appellant may have been romantically involved, but this testimony was vague and speculative at best. There was strong evidence that, at the time of the assault, A1C MM was romantically interested in a third Airman, A1C SH.

The events leading to appellant's charges began at a restaurant on the evening of 10 May 2013 and continued in various dormitory rooms through the early morning hours of the next day. During that timeframe, the appellant was with A1C MM as she drank mixed drinks and wine. She also drank vodka that the appellant provided and became extremely intoxicated. At different times during the course of the evening, A1C MM removed her shirt and exposed her sports bra, danced provocatively in front of the appellant and others, and sat in the appellant's lap. A1C MM became so inebriated that she was slurring her speech and had trouble walking. At one point, she tried to follow A1C SH out of the dormitory but had trouble walking, so the appellant and others tried to assist her. After talking with A1C SH, A1C MM became emotional and vomited multiple times while the appellant held her hair.

Multiple witnesses testified that the appellant appeared to be looking out for A1C MM and did not appear inebriated. By the end of the evening, A1C MM was being tended to by the appellant and two other Airmen (A1C JM and A1C CR). After seeing her become ill, the Airmen were concerned that A1C MM might pass out and aspirate her vomit. The appellant insisted they take her back to his room. A1C CR carried A1C MM while the appellant led the way.[1] A1C MM was not only unable to walk, she was incoherent and in and out of consciousness. When the Airmen arrived at the appellant's room, he told them to put A1C MM in his bed and that he would sleep on the floor. When she was placed in the bed, A1C MM's eyes were closed and she was not speaking.

When A1C MM awoke in the early morning hours of 11 May 2013, she had little or no recollection of what happened. She was wearing clothes that did not belong to her

---

[1] Video footage from a dormitory security camera shows her being carried by A1C CR.

and went back to her room to sleep. Later, while she was out with A1C JM and A1C CR, she began to piece facts together.

A1C MM testified that she remembered waking up in the appellant's dormitory room and seeing someone kneeling with his head between her legs performing oral sex on her. She remembered waking up again with the appellant on top of her and penetrating her vagina. She remembered the appellant trying to kiss her and that she vomited. A1C MM testified she had not consented to this sexual activity and that, in her condition, she was unable to resist or verbalize her lack of consent to these sexual acts.

For this conduct, the appellant was charged with four specifications under Article 120, UCMJ. He was charged with one specification of sexual assault for penetrating A1C MM's vulva with his penis when she was incapable of consenting due to alcohol impairment and one specification for doing so while she was asleep, unconscious, or unaware the act was occurring. He was also charged with two corresponding abusive sexual contact offenses for touching A1C MM's vagina with his tongue. The appellant was convicted of all four specifications.

Additional facts necessary to resolve the assigned errors are included below.

*Legal and Factual Sufficiency*

We review issues of factual and legal sufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). "The test for legal sufficiency of the evidence is 'whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt.'" *United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (quoting *United States v. Turner*, 25 M.J. 324 (C.M.A. 1987)). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001). The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the accused's guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

The appellant argues the government failed to prove beyond a reasonable doubt that the appellant engaged in the charged sexual conduct—penetration of A1C MM's vulva with his penis and touching her vagina with his tongue. The appellant also contends that the government failed to prove beyond a reasonable doubt that the sexual

activity was not consensual or that A1C MM was unable to consent or that she was asleep or unconscious when the activity occurred. Finally, the appellant argues the evidence proved that, even if mistaken, he had an honest and reasonable belief that A1C MM consented to the sexual activity. We disagree.

In a text message, A1C MM told the appellant she did not remember taking off her clothes or giving consent. In sending the message, she hoped the appellant would be able to explain what happened, but the appellant never responded. Initially, A1C MM could not remember if the sexual activity was consensual, but she testified that she had a dream about the assault that triggered a flood of memories and led her to conclude that she did not consent to the sexual activity.

A1C MM testified the appellant was penetrating her vagina, but she could not say with absolute certainty that he penetrated her with his penis. Given other evidence in the case, however, we are convinced beyond a reasonable doubt that this penile penetration occurred and that a reasonable factfinder could have found all of the essential elements beyond a reasonable doubt.

In her testimony, A1C MM did describe being penetrated—"as in intercourse"— while she was on her back with the appellant above her and moving. As this was happening, the appellant was asking her if it was "okay," and A1C MM recognized his voice. She confronted the appellant the next day, and he told her that he thought they had sex the night before but could not remember much. He also said he had found a broken condom in his bed. Concerned that she might be pregnant, A1C MM took a "Plan B" emergency contraceptive pill paid for by the appellant. The fact that the appellant paid for her emergency contraceptive pill suggests the appellant was concerned A1C MM might have been impregnated as a result of sexual intercourse and supports the conclusion the appellant penetrated A1C MM's vulva with his penis.

Within two days of the incident, A1C MM reported the assault, provided a statement to Air Force Office of Special Investigations agents, and was examined by a sexual assault nurse examiner (SANE). The examination included vaginal, anal, and rectal swabs. Sperm cells with DNA matching the appellant were found on A1C MM's rectal swab but none were found on her vaginal swab.[2] According to the testimony of the government's forensic experts, it is not uncommon to find sperm in the rectal cavity after vaginal intercourse, as seepage from the vagina may collect in the rectum. Moreover, sperm that collects in the rectum is less likely to be washed away in a shower than sperm deposited in the vagina. A1C MM did shower once before being examined by the SANE. The record of trial contains ample evidence to support a finding that the appellant's penis penetrated A1C MM's vulva.

---

[2] There was no allegation of nonconsensual sodomy in this case.

We also find the evidence legally and factually sufficient to support the allegation that the appellant touched A1C MM's vagina with his tongue. In her testimony, A1C MM said she awoke to find someone[3] kneeling between her legs performing oral sex on her, and that she could feel the warmth of this person's mouth on her vagina. When asked if she could tell if it was a tongue touching her, A1C MM said, "I want to say I could feel something, but I'm not 100 percent sure. It was kind of a numb feeling, but it was definitely there." The appellant contends the evidence is insufficient to prove it was the appellant's tongue that was touching her. We disagree. Oral sex typically involves use of the tongue, either directly or indirectly, to stimulate another person's genitalia. In fact, it is hard to imagine how the appellant's tongue would not have, at some point in the process, come in contact with A1C MM's vagina if he was performing oral sex on her. The record of trial contains ample evidence to support a finding that the appellant's tongue touched A1C MM's vagina.

The appellant also contends the government failed to present sufficient evidence to prove that A1C MM did not consent to this course of sexual conduct.[4] We disagree.

At trial, A1C MM testified she did not consent to any sexual activity with the appellant. There is overwhelming evidence that she was extremely intoxicated, to the point she was slipping in and out of consciousness before and at the time of the sexual activity. The appellant was with A1C MM from the beginning of the evening, he provided vodka to her, he witnessed how much alcohol she was drinking, and, just like everyone else, saw how she was behaving. The appellant held her hair while she vomited and insisted that she be carried to his room when she was too drunk to walk. It was obvious to everyone that A1C MM was very intoxicated while the appellant was, by all accounts, sober. A1C MM herself testified that the appellant's room was spinning and that she vomited before, during, and after the sexual activity. She also testified that she fell asleep after being taken to the appellant's dormitory room and only briefly awakened when she was being assaulted.

A1C MM consumed a large amount of alcohol over a relatively short period of time; the fact that she had some difficulty remembering events is not surprising. Ultimately, A1C MM did provide testimony about the assault and unequivocally denied giving the appellant consent to either the sexual act or the sexual contact. It is worth

---

[3] There is no evidence that anyone other than the appellant was in the room with A1C MM when this sexual activity occurred.

[4] The sexual assault specifications required the government to prove beyond a reasonable doubt that the appellant penetrated A1C MM's vulva with his penis when he knew or reasonably should have known that she was either incapable of consenting to the sexual act due to her alcohol impairment or was asleep, unconscious or otherwise unaware the sexual act was occurring. *See Manual for Courts-Martial, United States* (*MCM*), Part IV, ¶ 45(b)(2) and (3)(A) (2012 ed.) Similarly, the abusive sexual contact specifications required the government to prove he touched her vagina with his tongue when he knew or reasonably should have known that she was either incapable of consenting to the sexual contact due to her alcohol impairment or was asleep, unconscious or otherwise unaware the sexual activity was occurring. *Id.* at ¶ 45(d).

noting that A1C MM's initial reaction to the events was concern and disgust. In fact, after she began to remember events, A1C MM immediately confronted the appellant and demanded to know what happened. This reaction is not inconsistent with how a person would react if she believed that she had been assaulted. The fact that A1C MM could not immediately recall what happened to her or that her memory was incomplete is a factor that we considered, but, in light of everything else presented at trial, it is not particularly compelling.

We are convinced beyond a reasonable doubt that A1C MM did not consent to the sexual activity with the appellant. *MCM*, Part IV, ¶ 45(g)(8)(A) ("'[C]onsent' means a freely given agreement to the conduct at issue by a competent person."). "Lack of consent may be inferred based on the circumstances of the offense. All the surrounding circumstances are to be considered in determining whether a person gave consent . . . ." *MCM*, Part IV, ¶ 45(g)(8)(C). Having considered all the evidence presented at trial, we also find it sufficient to prove beyond a reasonable doubt that A1C MM was incapable of consenting to the sexual activity due to her level of alcohol impairment and because she was, at times during this sexual activity, asleep, unconscious, and unaware of what was happening.

Lastly, the appellant contends the evidence is insufficient as he had an honest and reasonable mistake of fact as to A1C MM's consent. As we stated recently, the history of the mistake of fact defense relative to certain offenses under the current version of Article 120, UCMJ is complicated and its applicability to certain offenses is unclear. *See United States v. Waddell*, ACM 38500, (A.F. Ct. Crim. App. 11 February 2015) (unpub. op.). Even if such a defense were applicable here, however, the appellant would not prevail given the evidence in the case. Based on that evidence, we are convinced beyond a reasonable doubt the appellant knew or reasonably should have known of A1C MM's impaired condition. The appellant's actions and observations on the night of the incident establish beyond a reasonable doubt that the appellant did not believe A1C MM was consenting and that any such belief would not have been reasonable.

As described above, A1C MM was highly intoxicated, and the appellant was aware of her condition. He arranged to have her placed in his bed while in that state. It is hard to know why the appellant would have been asking A1C MM if it was okay for him to penetrate her vagina with his penis. However, under the circumstances, the fact that he did ask is curious at best, and at worst, it demonstrates a consciousness of guilt as to his belief about her capacity to knowingly participate in the activity. Based on all the evidence adduced on this point, we are convinced beyond a reasonable doubt that the appellant did not have an honest or reasonable mistake of fact as to whether A1C MM was consenting to the sexual activity. Under the circumstances, no reasonable person would have held such beliefs. *See* Rule for Courts-Martial 916(j)(3).

We have reviewed the record of trial, paying particular attention to the evidence and reasonable inferences that can be drawn therefrom, including testimony from all the witnesses, the DNA evidence, and the video footage showing A1C MM being carried to the appellant's room because she was too incapacitated to walk on her own. In viewing the evidence in the light most favorable to the government, we conclude a rational factfinder could have found beyond a reasonable doubt that the appellant committed the offenses. Having reviewed the entire record and making allowances for not personally observing the witnesses, we ourselves are convinced of the appellant's guilt beyond a reasonable doubt.

*Unreasonable Multiplication of Charges*

In a motion to dismiss raised prior to trial, trial defense counsel claimed that the specifications alleging penile penetration covered the same single incident of sexual assault and the two specifications alleging tongue contact covered the same single incident of abusive sexual contact.[5] Contending the specifications were multiplicious or, in the alternative, unreasonably multiplied, the defense asked the military judge to dismiss one specification in each set or merge them for sentencing. During argument at trial, the defense conceded that the specifications were not multiplicious and that the real issue was unreasonable multiplication of charges.

Prior to the admission of evidence in the case and after analyzing the factors found in *United States v. Quiroz*, 55 M.J. 334, 338 (C.A.A.F. 2001), the military judge determined there was an unreasonable multiplication of charges.[6] He made the following findings:

1. The appellant objected at trial.

2. The two specifications alleging penile penetration, which occurred at the same time and place, criminalized the same conduct. Likewise, the two specifications alleging tongue contact, which occurred at the same time and place, criminalized the same conduct.

---

[5] The defense also unsuccessfully argued that the oral and vaginal sex were one continuous sex act and therefore constituted an unreasonable multiplication of charges. The appellant did not raise this issue on appeal.

[6] These factors include (1) whether the accused objected at trial, (2) whether each charge and specification is aimed at distinctly separate criminal acts, (3) whether the number of charges and specifications misrepresent or exaggerate the appellant's criminality, (4) whether the number of charges and specifications unreasonably increase the appellant's punitive exposure, and (5) whether there is any evidence of prosecutorial overreaching or abuse in the drafting of the charges. *United States v. Quiroz*, 55 M.J. 334, 338 (C.A.A.F. 2001). These non-exclusive factors are weighed together, and "one or more factors may be sufficiently compelling." *United States v. Campbell*, 71 M.J. 19, 23 (C.A.A.F. 2012).

3. The specifications of each charge misrepresented or unreasonably exaggerated the appellant's criminality, and subjecting the appellant to four specifications instead of two was unreasonable.

4. There was at least some evidence of prosecutorial overreaching.

5. The number of specifications did unreasonably increase the appellant's punitive exposure.

We agree with these findings and the military judge's conclusion, and the government does not contest them on appeal. The military judge elected, however, solely to merge the specifications for purposes of sentencing. We ordered briefing on whether the military judge should have consolidated or dismissed the specifications.

"A military judge's decision to deny relief for unreasonable multiplication of charges is reviewed for an abuse of discretion." *United States v. Campbell*, 71 M.J. 19, 22 (C.A.A.F. 2012) (citing *United States v. Pauling,* 60 M.J. 91, 95 (C.A.A.F. 2004)). Within the context of unreasonable multiplication of charges, the military judge generally has wide discretion to dismiss offenses, merge offenses for findings, or merge offenses only for purposes of sentencing. *See id.* at 25 (concluding that it was within the military judge's discretion to not dismiss or merge the specifications for findings but to merge them for sentencing). An offense found multiplicious for findings is necessarily multiplicious for sentencing, but the concept of unreasonable multiplication of charges may apply differently to findings than to sentencing. *Id.* at 23. When a factfinder "returns guilty findings for [multiple] specifications and it was agreed that these specifications were charged for exigencies of proof, it is incumbent [upon the military judge] either to consolidate or dismiss [the contingent] specification[s]," not merely merge then for sentencing purposes.[7] *United States v. Elespuru*, 73 M.J. 326, 329 (C.A.A.F. 2014) (quoting *United States v. Mayberry*, 72 M.J. 467, 467–68 (C.A.A.F. 2013)) (internal quotation marks and brackets omitted).

The military judge's ruling evidences the possibility that he may have been confused about his options for remedying the unreasonable multiplication of charges. The military judge may have believed that, under the circumstances, he was limited to

---

[7] "What is substantially one transaction should not be made the basis for an unreasonable multiplication of charges against one person." Rule for Courts-Martial (R.C.M.) 307(c)(4). The non-binding discussion following R.C.M. 307(c)(4) reminds us that "[t]here are times, however, when sufficient doubt as to the facts or the law exists to warrant making one transaction the basis for charging two or more offenses." *Id.* This is the practice that we refer to as charging in the alternative. In a way, charging in the alternative allows the government to "reasonably" multiply charges and specifications when they have doubts about their ability to prove certain offenses. The government chooses this option knowing that dismissal or consolidation of the multiplied charges is a potential, or even necessary, remedy when an accused is convicted of the multiplied offenses, particularly when Article 120, UCMJ, 10 U.S.C. § 920, offenses are charged in the alternative. This remedy serves to prevent the government from needlessly "pil[ing] on" charges. *United States v. Foster*, 40 M.J. 140, 144 n.4 (C.M.A. 1994).

merging the unreasonably multiplied specifications for sentencing only.[8] Regardless, for the following reasons, we find that the military judge abused his discretion when he merged the offenses for sentencing only.

First, we find that the government charged the specifications of each charge in the alternative. They had legitimate concerns about being able to prove each of the charged offenses and sought to hedge against a full acquittal by charging in the alternative. The government expressly argued as much in their written response to the original motion and during the closing argument on findings.[9] Under these circumstances, the appropriate remedy was either dismissal or consolidation of the multiplied specifications. *See Elespuru*, 73 M.J. at 329.

Second, even if we were to find that the government did not charge the specifications in the alternative, we find that the military judge clearly erred by fashioning a remedy that focused only on sentencing and not findings. The military judge correctly found that each of the *Quiroz* factors had been met. Most importantly, he

---

[8] In his ruling, the military judge noted

> the fact finder . . . has not [yet] received any evidence, deliberated, or provided a finding for these offenses. This court is hesitant to begin merging or dismissing charges prior to findings in this case . . . . The government may charge as many offenses as it desires so long as the offenses pass the [*United States v.*] *Teters*[, 37 M.J. 370 (C.M.A. 1993),] and *Blockburger* [*v. United States*, 284 U.S. 299 (1932),] tests. Should the government's failure of proof on one offense result in an acquittal, the point is moot. However, the fact finder should be provided with all of its options during deliberations on the entire spectrum of alleged criminal conduct and determine whether or not the burden of proof has been met for findings. If the finder of fact makes findings of guilt for all the alleged conduct then that may be an unreasonable multiplication of charges for sentencing . . . .

One way of interpreting the military judge's analysis is that he thought he was limited to merging the specifications for sentencing only, but his ruling is somewhat vague on this matter.

[9] During its closing argument on findings, the government argued that A1C MM was simultaneously unconscious and intoxicated to the extent that she could not consent. The trial counsel stated:

> What's relevant is that at 0403 she is so intoxicated she can't consent and at 0403 she passes out and she is incapable of consenting because she's passed out; she's unconscious. . . . At the very least if we were to subscribe to everything [the defense] suggest[s] in their theories, [the accused] is still guilty of that one charge of sexual assault when she is to [sic] – when she is to [sic] incapable of consenting due to impairment by alcohol because she's either asleep, unconscious, or otherwise unaware. He is still guilty.

Eventually, the government argued the appellant was guilty of not just assaulting A1C MM while she was unconscious but also after she regained consciousness. Then, in rebuttal, the government explained that the theory of their case was that between the hours of 0400 and 0541 A1C MM was "incapable of consenting due to impairment by alcohol and [the appellant] was having sex with her and performing oral sex on her when she was asleep, unconscious, or otherwise unaware." The government blended its culpability theories throughout the case.

found the proffered evidence demonstrated that there were only two crimes—not four—and that there was at least some evidence of prosecutorial overreaching. The military judge was understandably reluctant to dismiss or consolidate specifications before allowing the government to produce evidence and argue its case. However, nothing precluded him from dismissing or consolidating any multiplied specifications once findings had been entered.

Not doing so left the appellant convicted of four offenses even though the military judge found there were only two crimes. Multiple witnesses, including A1C MM, described how she became more intoxicated as the evening progressed. Eventually, A1C MM became so drunk that she lost motor function, vomited, became incoherent, and had to be carried away. The facts demonstrate that A1C MM was so intoxicated that she became unconscious. When A1C MM was left on the appellant's bed, her eyes were closed and she was not speaking. Based on her recollection of the events, she woke up in the appellant's room momentarily on two occasions: once to find the appellant performing oral sex on her and again to find him penetrating her vagina. The distinction between the specifications alleging intoxication and unconsciousness is an artificial one that is perfectly acceptable for charging in the alternative.

However, allowing the convictions to stand for all of these multiplied offenses would be unreasonable under the circumstances and constituted an abuse of the military judge's discretion. *See Quiroz*, 55 M.J. at 338 ("[T]he prohibition against unreasonable multiplication of charges has long provided courts-martial and reviewing authorities with a traditional legal standard—reasonableness—to address the consequences of an abuse of prosecutorial discretion in the context of the unique aspects of the military justice system."). There is a tangible harm in allowing an accused to be convicted multiple times for the same offense. Furthermore, our superior court has recognized the harm in allowing multiple convictions for the same offense to stand even when the military judge has merged the offenses for sentencing. *United States v. Roderick*, 62 M.J. 425, 433 (C.A.A.F. 2006); *see also United States v. Frelix-Vann*, 55 M.J. 329, 332–333 (C.A.A.F. 2001) (citing *Ball v. United States*, 470 U.S. 856 (1985)).

Such a situation can be resolved through dismissal or consolidation of the unreasonably multiplied specifications. *See Campbell*, 71 M.J. at 22–23 (discussing the options to merge or dismiss offenses that create an unreasonable multiplication of charges for findings). Our sister court recently examined the potential remedies for an unreasonable multiplication of charges for findings in a case very similar to this one. *See United States v. Thomas*, 74 M.J. 563 (N.M. Ct. Crim. App. 2014). In *Thomas*, the appellant had sex with his victim while she was drunk and unconscious. Just like A1C MM in the case at bar, that victim had trouble recollecting the events but she did remember "snapshots" of a male figure by her bed and someone on top of her having sex with her. *Id.* at 566. Among other things, the government charged the accused with two

sexual assaults for the same sexual act: one committed while the victim was unconscious and one while she was incapable of consenting because she was intoxicated.[10] *Id.* at 565.

The Navy-Marine Corps court discussed the remedy of consolidation (merger) of the unreasonably multiplied specifications in appropriate cases to reflect each conviction in a single specification while not disturbing the findings of guilt with respect to those specifications. *Id.* at 569. The opinion includes a helpful discussion of when it may be appropriate to consolidate offenses instead of dismissing them. *Id.* at 568–70; *see also United States v. Chin*, ACM 38452 (recon.), unpub. op. at 18–19 (A.F. Ct. Crim. App. 12 June 2015); *United States v. Perez*, Army 20130368 (Army Ct. Crim. App. 7 April 2015). The court reasoned that

> [d]ismissal of a lesser included offense in favor of the remaining greater offense may be the appropriate remedy where the unreasonably multiplied offenses stand in a greater-lesser relationship. In other cases, consolidation may be the more appropriate remedy as "the findings of guilty as to [consolidated] specifications are *not* affected because they still apply to the portions of the specifications added to the remaining specification . . . ." *United States v. Sorrell*, 23 M.J. 122, 122 n.1 (C.M.A. 1986) (emphasis added). Consolidation is accomplished by simply combining the operative language from each specification into a single specification that adequately reflects each conviction.

*Thomas*, 74 M.J. at 568-69.[11]

---

[10] Apparently, the government did not concede the charges were pled in the alternative. Nevertheless, with respect to this issue, our sister court found the charges were, in fact, charged in the alternative and held as follows:

> Although the Government in this case did not concede that the various sexual assault offenses were pled in the alternative to deal with contingencies of proof, the record clearly supports that conclusion. Both remaining aggravated sexual assault specifications allege the same sexual act, on the same date, and at the same place. One alleges that the appellant committed the sexual act while [the victim] was asleep or otherwise unaware; the other alleges the same sexual act, but while [the victim] was incapable of consenting due to impairment by an intoxicant. While we find that it was entirely proper for the Government to charge the appellant in this fashion, it is not appropriate for him to stand convicted of two sexual assault offenses based upon a single criminal act. *See Elespuru*, 73 M.J. at 329-30; *Campbell*, 71 M.J. at 24. Accordingly, we find that the military judge erred by only merging the offenses for sentencing purposes.

*United States v. Thomas*, 74 M.J. 563, 568 (N.M. Ct. Crim. App. 2014).

[11] The court explained that because the consolidation takes place post-conviction, the resulting duplicitous specification does not violate Rule for Courts-Martial 307(c)(4). *Thomas*, 74 M.J. at 569 n.3.

We find consolidation to be the correct solution here and will take appropriate action in our decretal paragraph.

*Sentence Appropriateness*

The appellant argues that his sentence is both inappropriately severe and "highly disparate" compared with "closely related" cases. We disagree.

The appellant has provided three examples of cases that he avers are "closely related" and resulted in sentences that are "highly disparate" in comparison to the appellant's. "At a Court of Criminal Appeals, an appellant bears the burden of demonstrating that any cited cases are 'closely related' to his or her case and that the sentences are 'highly disparate.'" *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999). Closely related cases include those which pertain to "coactors involved in a common crime, servicemembers involved in a common or parallel scheme, or some other direct nexus between the servicemembers whose sentences are sought to be compared." *Id.*

Having reviewed the matters submitted by the appellant and applying the standard set forth in *Lacy*, we find the appellant has failed to meet his burden of demonstrating that the cases he cited are "closely related." These cases do not involve coactors involved in a common crime, servicemembers involved in a common or parallel scheme, or some other direct nexus between the servicemembers; and there is no direct nexus between the appellant and the accused in the other cases.

This court reviews sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006). We "may affirm only such findings of guilty and the sentence or such part or amount of the sentence, as [we find] correct in law and fact and determine[], on the basis of the entire record, should be approved." Article 66(c), UCMJ. "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009). Although we are accorded great discretion in determining whether a particular sentence is appropriate, we are not authorized to engage in exercises of clemency. *See United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010).

While outward appearances gave the impression that the appellant was looking out for A1C MM, in reality he took advantage of his friend and fellow Airman when she was very vulnerable. The offenses the appellant was convicted of were serious, and they have had a very detrimental effect on A1C MM. The maximum punishment for the offenses that the appellant was found guilty of included a dishonorable discharge, 37 years of

confinement, total forfeitures, and a reduction to the grade of E-1.[12] Appellant's sentence to seven years of confinement and a reduction to the grade of E-1 did not include a punitive discharge and was well below the maximum term of confinement. Furthermore, we find the adjudged and approved sentence would have been the same even if the military judge had dismissed or consolidated the specifications at trial, instead of just merging the specifications of both charges for sentencing purposes. *See United States v. Moffeit*, 63 M.J. 40, 41 (C.A.A.F. 2006) ("[I]f the court can determine to its satisfaction that, absent any error, the sentence adjudged would have been of at least a certain severity then a sentence of that severity or less will be free of the prejudicial effects of error . . . ."); *see also United States v. Winckelmann*, 73 M.J. 11 (C.A.A.F. 2013).

We have carefully considered the appellant, the nature and seriousness of the offenses he was convicted of, the appellant's record of service, and all matters contained in the record of trial. We have no difficulty finding that the appellant's sentence is correct in law and fact and should be approved.

*Conclusion*

Specifications 1 and 2 of the Charge are hereby consolidated into one specification that reads as follows:

> In that AIRMAN FIRST CLASS JOSEPH MORENO GALLEGOS JR., United States Air Force, 19th Aircraft Maintenance Squadron, Little Rock Air Force Base, Arkansas, did, at or near Little Rock Air Force Base, Arkansas, on or about 11 May 2013, commit a sexual act upon Airman First Class MM by penetrating the vulva of Airman First Class MM with his penis when A1C MM was incapable of consenting to the sexual act because she was impaired by an intoxicant, to wit: alcohol, and was asleep, unconscious, or unaware the sexual act was occurring, a condition that was known or reasonably should have been known by the accused.

Specifications 1 and 2 of the Additional Charge are hereby consolidated into one specification that reads as follows:

> In that AIRMAN FIRST CLASS JOSEPH MORENO GALLEGOS JR., United States Air Force, 19th Aircraft Maintenance Squadron, Little Rock Air Force Base, Arkansas, did, at or near Little Rock Air Force Base, Arkansas, on or about 11 May 2013, touch the vagina of Airman First Class MM with his tongue, with the intent to gratify his own sexual desire, when Airman First Class MM was incapable of consenting to the sexual contact

---

[12] Had the specifications not been merged for sentencing, the maximum confinement would have been 74 years.

because she was impaired by an intoxicant, to wit: alcohol, and was asleep or unconscious, a condition that was known or reasonably should have been known by the accused.

With this modification, the findings and the sentence are **AFFIRMED**.



FOR THE COURT

STEVEN LUCAS
Clerk of the Court